UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------X
                                                  :
JODY RUCKS,                                       :
                                                  :
                              Plaintiff,          :
                                                  :        12 Civ. 4226 (KPF)
               v.                                 :
                                                  :        OPINION AND ORDER
CITY OF NEW YORK, *et al.*,                       :
                                                  :
                              Defendants.         :
                                                  :
--------------------------------------------------X

```
┌──────────────────────────────────┐
│ USDC SDNY                         │
│ DOCUMENT                          │
│ ELECTRONICALLY FILED              │
│ DOC #: _____           │
│ DATE FILED: March 30, 2015        │
└──────────────────────────────────┘
```

KATHERINE POLK FAILLA, District Judge:

Plaintiff Jody Rucks[1] brought this action in May 2012 against the City of New York and New York City Police Department ("NYPD") officers Anthony Bruno, Michael O'Connor, and Michael Percy (collectively, the "Defendant Officers") in their individual and official capacities. In it, Plaintiff raised claims of false arrest, excessive force, denial of fair trial, and malicious prosecution under 42 U.S.C. § 1983, and for assault and battery under New York state law, stemming from his June 18, 2011 arrest and subsequent events. On July 14, 2014, following a one-week trial, a jury found for Plaintiff on his claims of false arrest and denial of fair trial, and for Defendants on the remaining claims. Both parties have filed motions for judgment as a matter of law and for a new trial pursuant to Federal Rules of Civil Procedure 50 and 59. For the reasons set forth in the remainder of this Opinion, the Court denies Defendants'

---

[1]    Plaintiff testified that he legally changed his name to King Rucks in 2009 (Trial Transcript ("Tr.") 577), though he filed the instant lawsuit under his given name of Jody Rucks.

motions for judgment as a matter of law or a new trial, and grants Plaintiff's motion for judgment as a matter of law as to his assault and battery claims and a new trial for damages.

## BACKGROUND[2]

### A.    The Pretrial Procedural History

Plaintiff Jody Rucks filed his Complaint against the City of New York and three individual NYPD officers — Officers Bruno and Percy, and Sergeant O'Connor — on May 29, 2012.  (Dkt. #1).  In it, he brought claims under 42 U.S.C. § 1983 for false arrest, excessive force, denial of fair trial, and malicious prosecution, and under New York state law for assault, battery, false arrest, false imprisonment, intentional infliction of emotional distress, malicious prosecution, and negligent hiring, training, supervision, and retention.  (*Id.*).  On June 24, 2013, the case was reassigned to the undersigned from United States District Judge Laura Taylor Swain.  (Dkt. #18).  On June 26, 2013, the parties stipulated to the voluntary dismissal of Plaintiff's claims against the City of New York for negligent hiring, training, supervision, and retention, as well as claims for municipal liability pursuant to *Monell* v. *Department of Social Services*, 436 U.S. 658 (1978); in addition, Plaintiff dismissed the claim of intentional infliction of emotional distress against all parties.  (Dkt. #20).  Trial commenced on July 8, 2014.  (Tr. 1).

---

[2]    The parties' memoranda of law in connection with Defendants' post-trial motion are referred to using the conventions "Def. Br.," "Pl. Opp.," and "Def. Reply."  The parties' memoranda of law in connection with Plaintiff's post-trial motion are referred to using the conventions "Pl. Br.," "Def. Opp.," and "Pl. Reply."

**B.      The Evidence at Trial**

**1.      Plaintiff's Evening and Arrival at the West 4th Street Station**

Plaintiff spent the evening of June 17, 2011, at an art gallery event on West 27th Street in Manhattan's Chelsea neighborhood.  (Tr. 579-80).  Plaintiff consumed one plastic cup of wine and departed at, by his estimate, roughly 2:30 a.m. to 3:00 a.m. on the morning of June 18.  (*Id.* at 582-83).  Witness Kasey Schweickert, who hosted the event, confirmed Plaintiff's presence and his consumption of roughly one cup of wine, though she placed his departure at roughly 1:00 a.m. to 2:00 a.m.  (*Id.* at 569-71).  Plaintiff boarded the southbound E train at the West 23rd Street station, intending to transfer at the Canal Street station to the A or C train, and then take one of those trains to the Nostrand Avenue stop in Brooklyn, near where he lived.  (*Id.* at 584).  When he arrived at Canal Street, however, he discovered that, due to construction, he would have to return uptown to the West 4th Street station, where he could then transfer to the downtown A or C train.  (*Id.* at 584-85).  Accordingly, he boarded the E train headed north toward the West 4th Street station.  (*Id.* at 105-06, 585).

Defendants Bruno, O'Connor, and Percy, meanwhile, were patrolling the West 4th Street station along with Officer Joel Estevez, who was not named as a defendant.  (Tr. 214).  The officers, who were wearing plainclothes, were assigned to the location to focus on "quality-of-life" crimes.  (*Id.* at 95-99, 212).  Their shift began at 3:00 a.m.  (*Id.* at 95).  Plaintiff's northbound E train arrived at the station at roughly 3:30 a.m. to 4:00 a.m.  (*Id.* at 99, 167).  It is at this

point in the narrative that Plaintiff's testimony began to diverge significantly from that of each of the Officer Defendants.

### 2.    Plaintiff's Exit from the Northbound E Train at West 4th Street

The West 4th Street station is divided into multiple levels. The uppermost level, where the events in question took place, is split into two platforms that offer access to four tracks serving the uptown and downtown A, C, and E trains. The southbound trains are accessible by the southbound platform and the northbound trains are accessible by the northbound platform. Express trains (the A) run on the two tracks located between the two platforms, while local trains (the C and Plaintiff's E train) run on tracks located to the outside of their respective platforms. Below this level, accessible by a number of stairways, is a mezzanine by which one can pass under the A, C, and E trains to move between the uptown and downtown platforms, as well as access the B, D, F, and M trains located on the lowest level. (Tr. 121, 222-23).

At the time that Plaintiff's E train arrived at the West 4th Street station on the northbound local track (the furthest track from the southbound platform), O'Connor, Bruno, and Estevez were on the northbound platform, while Percy was on the southbound platform. (Tr. 449, 545). O'Connor was located toward the northern end of the northbound platform, very near to where Plaintiff arrived on the E train. (*Id.* at 545-46). O'Connor testified[3] that he observed Plaintiff lying completely horizontally across several subway seats,

---

[3]    Due to O'Connor's unavailability at trial, certain portions of his prior sworn testimony were read into the record. (Tr. 542). *See* Fed. R. Evid. 804(b).

4

apparently sleeping.  (*Id.* at 546).  O'Connor testified that he nudged Plaintiff, identified himself as a police officer, and asked Plaintiff to step outside the train, which he did.  (*Id.* at 547).  O'Connor recalled other passengers on the train, but could not say how many.  (*Id.* at 547-48).

Bruno at this time was also on the northbound platform, further north than O'Connor.  (Tr. 282).  He testified that he saw O'Connor speak to the conductor and then step into a subway car, at which point he began walking briskly or jogging toward that car in time to observe Plaintiff standing and rubbing his eyes as though he had just awakened.  (*Id.* at 282-86).  He did not personally see Plaintiff lying down, but O'Connor told Bruno that he had seen Plaintiff lying down on the subway seats.  (*Id.* at 286-97).

Percy at this time was on the southbound platform.  (Tr. 121).  He testified that across the express tracks and the northbound platform he was partially able to see Plaintiff — from the mid-torso down — lying across several subway seats.  (*Id.* at 122-23).  He either did not see or did not focus on any other passengers in the subway car.  (*Id.* at 124-25).  Percy testified, after being confronted with some arguably inconsistent prior statements of his, that his attention was taken away at the moment that O'Connor and Bruno entered the subway car; although he did not see O'Connor and Bruno wake Plaintiff up, he assumed they did so.  (*Id.* at 139-45, 220).  As Plaintiff and the two officers emerged from the subway car, O'Connor waved Percy over.  (*Id.* at 220-21).  In response, Percy descended the stairway to the mezzanine, walked across, and ascended the stairway to the northbound platform.  (*Id.* at 222-23).

Estevez was on the extreme northern end of the northbound platform at the time when O'Connor and Bruno encountered Plaintiff roughly five to six subway car lengths away. (Tr. 449-50). Estevez was watching for riders avoiding the subway fare by hopping over the turnstiles or going through in pairs; an occurrence of the former at the same time that O'Connor and Bruno first encountered Plaintiff temporarily distracted him. (*Id.* at 450).

Plaintiff testified to a very different sequence of events. After transferring to the northbound E train at the Canal Street station, Plaintiff testified that he remained seated, fully awake and with his feet on the floor, for the two stops from Canal Street to West 4th Street. (Tr. 586-87). Plaintiff testified that there were only two other people on the train when he arrived at West 4th Street. (*Id.* at 587-88). At West 4th Street, Plaintiff stood up of his own accord and walked out of the subway car, not encountering any officers until O'Connor called out to him after Plaintiff had taken roughly five steps off the train toward the stairs to the southbound platform. (*Id.* at 588-89).

### 3.  Plaintiff's Encounter with the Officers on the Platform

The testimony of the parties at trial momentarily converged at this point, as Plaintiff was standing on the northbound platform with O'Connor and Bruno, joined shortly by Percy. (*See* Tr. 223-25 (Percy's testimony), 516 (O'Connor), 591-92 (Rucks)). O'Connor showed Plaintiff his badge and asked for his identification, which Plaintiff surrendered either to Bruno directly or to O'Connor, who then passed it to another of the Defendant Officers. (*See id.* at 516, 592). Bruno ran a name check to see if Plaintiff had any outstanding

warrants, which he did not.  (*Id.* at 516).  After Percy arrived, Bruno borrowed a criminal summons (a "C-summons") from Percy and at O'Connor's instruction wrote a summons for disorderly conduct.  (*Id.* at 110-13).[4]  The parties dispute Plaintiff's conduct during the issuance of the summons — Plaintiff testified that he was silent and more or less motionless (*id.* at 654-55), while the Defendant Officers testified that he was yelling, cursing, and attracting a crowd (*id.* at 162-64, 292, 516-18) — but agree that after receiving the summons, Plaintiff disposed of it in a nearby trash receptacle (*id.* at 601-05).

Plaintiff testified that, somewhat taken aback, he walked to the platform's edge to check for an approaching train, before remembering that he needed to relocate to the southbound platform.  (Tr. 605).  Upon remembering, he turned back in the direction of the officers, walking toward them to get to the stairway to the mezzanine, and told O'Connor, "You know you can't get away with this, right?  This is BS."  (*Id.* at 605-08).  At that point, Plaintiff testified, O'Connor yelled, "Cuff him," and placed a handcuff on Plaintiff's left wrist.  (*Id.* at 611).  Plaintiff testified that he instinctually grabbed his arm, before one or more officers tripped him to the ground, where he grabbed onto the stairway railing adjacent to him as multiple officers struck him from atop him as they tried to get the handcuffs on his other wrist.  (*Id.* at 612-18).  Shortly thereafter, Plaintiff was sprayed in the face with mace without warning.

---

[4]     Although Percy testified that he believed at the time that Plaintiff was being given a summons for lying down on the subway seats, such a summons would ordinarily take the form of a Transit Adjudication Bureau ("TAB") summons rather than a C-summons. (Tr. 110-13).  Percy elsewhere indicated that the C-summons could be used as a "universal summons."  (*Id.* at 247-48).

(*Id.* at 619-20).  Four to five seconds later the "beatdown" finally ended as Plaintiff was handcuffed, dragged to his feet, and marched out of the station by the Defendant Officers and multiple other officers who had arrived by this point.  (*Id.* at 618-23).

The Defendant Officers' testimony, with some variations between and among their accounts, paints a rather different portrait of the events immediately after Plaintiff discarded the summons.  According to them, Plaintiff either touched or grabbed O'Connor and Bruno or menaced them, while pacing vigorously and cursing.  (Tr. 185 (Percy testifying that Plaintiff grabbed O'Connor and Bruno's shoulders with one hand to each), 355-57 (Bruno testifying that Plaintiff grabbed or touched both O'Connor and Bruno), 523 (O'Connor testifying that Plaintiff touched neither officer, but came at them in a "boxer's stance")).  At this point, O'Connor put a handcuff on Plaintiff before a struggle commenced.

Estevez testified to seeing Plaintiff and the Defendant Officers in a pile on the ground and running over to help (Tr. 452); in addition, at least two other officers responded to a call for reinforcements radioed by Bruno during the struggle (*id.* at 474-79).  All three Defendant Officers described Plaintiff as having extraordinary strength, both at trial and to Assistant District Attorney Danielle Labadorf in the course of Plaintiff's subsequent criminal prosecution. (*Id.* at 410-11).  Percy in particular described Plaintiff as forcibly standing with five to six officers draped on him, and throwing officers back and forth across the narrow subway platform.  (*Id.* at 235-40).  Percy, Bruno, and Estevez all

8

attributed Plaintiff's strength potentially to the influence of narcotics, the former two specifically identifying PCP as a possibility (*id.* at 203, 377, 455); Plaintiff, who is 5'9" and 185 pounds, denied having ever taken PCP or ingesting any drugs other than the single cup of wine that evening (*id.* at 582-83).  Ultimately, according to Percy, Percy sprayed mace into Plaintiff's face after warning him, and shortly thereafter the five to six officers were able to subdue him and remove him from the subway station.  (*Id.* at 240-43).

After being handcuffed, Plaintiff was taken to the Canal Street subway station precinct for booking.  (Tr. 628).  After being processed, Plaintiff was taken to Bellevue Hospital Center to have the mace washed out of his eyes.  (*Id.* at 631-32).  Plaintiff also received an x-ray examination of his ribs (*id.* at 632); though the hospital examination revealed no injuries, Plaintiff testified to numbness in his left arm, lacerations on his left wrist (which he supported with photographic evidence), and serious bruising (*id.* at 643-45).  Bruno was also taken to Bellevue Hospital from the scene with shortness of breath as well as neck and back pain.  (*Id.* at 471).  Plaintiff appeared before a judge late on the evening of June 18, 2011, at which point he was charged with obstructing governmental administration and then released roughly 24 hours after his initial arrest.  (*Id.* at 634-36).

### 3.    Plaintiff's State Court Prosecution

Plaintiff's case was presented to the Early Case Assessment Bureau ("ECAB") of the Manhattan District Attorney's office, where a criminal complaint and a D.A. data sheet (a set of internal notes) were drafted based on

9

the declarations of Percy.  (Tr. 392-401, 429).  Plaintiff's case was reassigned to ADA Labadorf nearly six months later, in approximately December 2011, shortly after she began working at the District Attorney's office.  At that point, 84 of the prosecution's 90 days of "chargeable time" had already run under New York's speedy trial law, N.Y. Crim. Proc. L. § 30.30.  (Tr. 418).  Labadorf met with Bruno and O'Connor on December 28, 2011, and with Percy and Estevez on other occasions.  (*Id.* at 407-09).  During her meetings with the Officer Defendants and Estevez, the officers suggested that Plaintiff was "out of control" and "extremely strong ... the image of the [H]ulk."  (*Id.* at 411).  On January 18, 2012, the State declared itself ready for trial, though trial did not proceed that day due to jury unavailability.  (*Id.* at 403-04).

On or about that date, Labadorf gave Plaintiff notice that the State was considering filing a felony charge.  (Tr. 404-06).  On February 7, 2012, Labadorf attended a proffer session with Plaintiff under a "queen for a day" agreement, pursuant to which Plaintiff's statements could not be used directly to prosecute him.  (*Id.* at 407).  On February 9, 2012, there was another court appearance that did not result in trial.  (*Id.* at 414).  On March 28, at yet another court appearance that did not result in trial, Labadorf withdrew notice of possible felony charges, intending to proceed on the misdemeanor charge of obstructing governmental authority.  (*Id.* at 414).  Finally, at a court appearance on May 16, 2012, the State conceded that the time to bring the case under New York's speedy trial law had run, and the case was dismissed.  (*Id.* at 415).

**C.      Defendants' Mid-Trial Motion and the Verdict**

Following the presentation of this evidence during Plaintiff's case, the

parties conferred with the Court on July 11, 2014.  Defendants made a motion

for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50.

(Tr. 721).  Defendants argued that judgment as a matter of law was appropriate

as to the false arrest claims against Percy and Bruno, as they were entitled to

rely on the statements made to them by O'Connor that he saw Plaintiff sleeping

on the train.  (*Id.* at 722).  Defendants argued that no reasonable juror could

find against any of Defendants for excessive force, given Plaintiff's lack of

injuries.  (*Id.* at 722-24).  Defendants further argued that the denial of fair trial

claim necessarily failed because it was based on statements made by the

Officer Defendants to Labadorf, which would be inadmissible at any

prosecution of Plaintiff and subject to absolute immunity if recounted at trial.

(*Id.* at 724-31).  Defendants next argued that the malicious prosecution claim

failed as a matter of law because only Percy could be considered to have met

the requirement of initiation.  (*Id.* at 732-34).  Finally, Defendants argued that

all of the Officer Defendants were entitled to qualified immunity as to each

claim.  (*Id.* at 724).  The Court reserved judgment on the motion.  (*Id.* at 733).

The Court then conferred with the parties regarding the charge, which

had been previously distributed to the parties.  Relevant to the instant motions,

Plaintiff objected to the draft charge with regard to the state law assault and

battery claims.  (Tr. 747-49).  As drafted (and ultimately read to the jury), the

charge indicated that in the context of a lawful arrest, officers were entitled to

11

use a reasonable amount of force, so that the assault and battery claims under state law would largely parallel the excessive force claim.  Plaintiff argued that the jury should additionally be instructed that, in the event the arrest was found to be unjustified, i.e., lacking in probable cause, assault and battery would follow from the act of forcibly placing Plaintiff under arrest.  (*Id.*).  The charge as read to the jury did not reflect this argument or indicate that even a reasonable amount of force could constitute assault and battery in the absence of probable cause.  (*Id.* at 878-82).

The jury was charged on July 14, 2014, and it returned a verdict that same day.  The jury found for Plaintiff against all Defendants on his false arrest claim, awarding $12,500 in compensatory damages and no punitive damages.  (Tr. 898-99).  The jury found for Plaintiff against all Defendants as well on his denial of fair trail claim, awarding $12,500 in compensatory damages and no punitive damages.  (*Id.* at 900-01).  The jury found for Defendants on Plaintiff's claims for excessive force, malicious prosecution, assault, and battery.  (*Id.* at 899-902).  Plaintiff's counsel pointed out to the Court the inconsistency between the verdicts finding false arrest and not finding assault and battery, but the Court indicated that such objections would best be dealt with in post-trial motions.  (*Id.* at 903-04).

The Court then submitted to the jury a "Special Verdict Form" prepared after discussion with the parties, which the Court would use in assessing Defendants' claims of qualified immunity.  (Tr. 902-09).  The questions, and the jury's answers, were as follows:

1.     Did Plaintiff have one or more of his feet on the seat on the subway?  *No.*

2.     Did Defendant Bruno believe that Plaintiff had one or more of his feet on the seat on the subway?  *No.*

3.     Did Defendant O'Connor believe that Plaintiff had one or more of his feet on the seat on the subway?  *Yes.*

4.     Did Defendant Percy believe that Plaintiff had one or more of his feet on the seat on the subway?  *Yes.*

5.     Did Plaintiff occupy more than one seat on the subway?  *No.*

6.     Did Defendant Bruno believe that Plaintiff was occupying more than one seat on the subway?  *No.*

7.     Did Defendant O'Connor believe that Plaintiff was occupying more than one seat on the subway?  *Yes.*

8.     Did Defendant Percy believe that Plaintiff was occupying more than one seat on the subway?  *Yes.*

9.     Was Plaintiff yelling on the subway platform prior to being placed into one or more handcuffs?  *No.*

10.    Was Plaintiff using abusive or obscene language prior to being placed into one or more handcuffs?  *No.*

11.    Were there other civilians in the subway station that observed Plaintiff's interaction with the police officers before Plaintiff was issued a summons?  *No.*

12.    Were there other civilians in the subway station that observed Plaintiff's interaction with the police officers after Plaintiff was issued a summons?  *No.*

13.    Did Plaintiff intend to cause public annoyance or public alarm in the subway station?  *No.*

14.    Did the Defendant Officers believe that Plaintiff was approaching the police officers with his arms up in a hostile manner after he threw the summons in the garbage?  *No.*

15.    Did Plaintiff get within two feet of the Defendant Officers after he threw the summons in the garbage?  *Yes.*

16.    Did Plaintiff grab Defendant O'Connor's shoulders prior to being placed into one or more handcuffs?  *No.*

17.    Did Plaintiff grab Defendant Bruno's shoulders prior to being placed into one or more handcuffs?  *No.*

13

      18.    Did Plaintiff physically touch any police officers at any point prior to being placed in one or more handcuffs? *Yes.*

(Def. Br., Ex. A; Tr. 922-25).

## D.     The Parties' Post-Trial Motions

On August 29, 2014, Plaintiff filed a motion for judgment as a matter of law as to Plaintiff's state law assault and battery claims, and for a new trial on damages as to those claims.  (Dkt. #78).  On September 3, 2014, Defendants filed a motion for judgment as a matter of law as to Plaintiff's false arrest and denial of fair trial claims, or in the alternative for a new trial.  (Dkt. #81).  Defendants filed their brief in opposition to Plaintiff's motion on October 14, 2014 (Dkt. #84), and Plaintiff filed his brief in opposition to Defendants' motion on the same day (Dkt. #85).  Plaintiff filed his reply brief in support of his motion on November 14, 2014 (Dkt. #89), and the briefing was complete upon the filing of Defendants' reply brief in support of their motion on November 17, 2014 (Dkt. #90).

## DISCUSSION

## A.     Applicable Law

Federal Rule of Civil Procedure 50 "imposes a heavy burden on a movant, who will be awarded judgment as a matter of law only when 'a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Cash* v. *County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quoting Fed. R. Civ. P. 50(a)(1)); *accord Bucalo* v. *Shelter Island Union Free Sch. Dist.*,

691 F.3d 119, 127-28 (2d Cir. 2012).  The "burden is particularly heavy where, as here, the jury has deliberated in the case and actually returned its verdict in favor of the non-movant." *Cash*, 654 F.3d at 333 (internal quotation marks omitted).  In such circumstances, a court may set aside the verdict only if, viewing the evidence in the light most favorable to the non-movant, "there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." *Id.* (internal quotation marks omitted); *accord Stampf* v. *Long Island R. Co.*, 761 F.3d 192, 197-98 (2d Cir. 2014); *see also, e.g.*, *Zellner* v. *Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007) (stating that a Rule 50 motion may be granted only if the court concludes that "a reasonable juror would have been compelled to accept the view of the moving party" (internal quotation marks omitted)).

In deciding a motion under Rule 50, the Court must disregard any evidence that weighs against the jury's verdict unless the jury was required to believe it.  *Zellner*, 494 F.3d at 370 (quoting *Reeves* v. *Sanderson Plumbing*, 530 U.S. 133, 150-51 (2000)).  The jury is required to believe the testimony of unimpeached, disinterested, uncontradicted, and plausibly credible witnesses. *See, e.g.*, *Reeves*, 530 U.S. at 151.  The question is whether, if credibility assessments are made against the moving party and all reasonable inferences are drawn against the moving party, a reasonable jury nevertheless would have

15

no choice but to find in the movant's favor.  *Zellner*, 494 F.3d at 370-71 (citing *Piesco* v. *Koch*, 12 F.3d 332, 343 (2d Cir. 1993)).

Federal Rule of Civil Procedure 59 authorizes a district court to "grant a motion for new trial under Rule 59 if 'the jury has reached a seriously erroneous result or its verdict is a miscarriage of justice.'"  *Stampf*, 761 F.3d at 202 (alteration omitted) (quoting *Nimely* v. *City of New York*, 414 F.3d 381, 392 (2d Cir. 2005)).  However, the Second Circuit's "cases teach that a high degree of deference is accorded to the jury's evaluation of witness credibility, and that jury verdicts should be disturbed with great infrequency."  *ING Global* v. *United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 98-99 (2d Cir. 2014).

> Unlike on a Rule 50 motion, however, on a Rule 59 motion the court "may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner."  But when, as here, "a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except in an egregious case, to correct a seriously erroneous result, or to prevent a miscarriage of justice."

*Id.* (quoting *Raedle* v. *Credit Agricole Indosuez*, 670 F.3d 411, 418-19 (2d Cir. 2012)); *accord DLC Mgmt. Corp.* v. *Town of Hyde Park*, 163 F.3d 124, 133-34 (2d Cir. 1998).

## B.   Analysis

### 1.   Defendants' Motion for Judgment as a Matter of Law or a New Trial Is Denied as to the Denial of Fair Trial Claim

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such

16

an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti* v. *N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997).  Elsewhere, the Second Circuit has stated that "[a] person suffers a constitutional violation if an [i] investigating official [ii] fabricates evidence [iii] that is likely to influence a jury's decision, [iv] forwards that information to prosecutors, and [v] the plaintiff suffers a deprivation of liberty as a result." *Jovanovic* v. *City of New York*, 486 F. App'x 149, 152 (2d Cir. 2012) (summary order).  The Second Circuit made clear in *Ricciuti* that the claim is available even where a trial does not actually take place.  *See* 124 F.3d at 127 (allowing claim where all charges were dismissed before trial).  At the same time, the claim cannot be maintained where the fabricated information or evidence is testimony protected by absolute immunity, whether at trial or before a grand jury.  *See Jovanovic*, 486 F. App'x at 152.

Recently, the Second Circuit considered the impact on the denial of fair trial claim of the Supreme Court's decisions in *Briscoe* v. *LaHue*, 460 U.S. 325 (1983), and *Rehberg* v. *Paulk*, 132 S. Ct. 1497 (2012), which extended absolute immunity to, respectively, trial testimony and grand jury proceedings as well as the immediate preparation for such proceedings.  In *Coggins* v. *Buonora*, 776 F.3d 108 (2d Cir. 2015), the Second Circuit held that *Rehberg* does not extend to false statements made to a prosecutor consistent with, but independent of, grand jury testimony.  In evaluating a claim of denial of fair trial based on such statements,

> the court should determine whether the plaintiff can
> make out the elements of his § 1983 claim without
> resorting to the grand jury testimony. If the claim exists
> independently of the grand jury testimony, it is not
> "based on" that testimony, as that term is used in
> *Rehberg*. Conversely, if the claim requires the grand
> jury testimony, the defendant enjoys absolute immunity
> under *Rehberg*.

*Id.* at 113 (internal citation omitted).

The core of the dispute between the parties in the instant case is on the second and third elements of the denial of fair trial claim as framed by *Jovanovic*; essentially, the parties dispute whether the false statements that the jury determined the Defendant Officers made — to each other, on police reports, and to ADA Labadorf — constituted evidence likely to influence a jury's decision. Defendants argue that the statements of the Defendant Officers were inadmissible hearsay that could not have been likely to influence a jury; alternatively, to the extent the false narrative of Plaintiff's actions would have been repeated at trial, it would have been in testimonial form subject to absolute immunity under *Rehberg*. (Def. Br. 5-11).

These arguments are unavailing. First, it is clear that absolute immunity for trial testimony does not extend to cover statements made at any time that have some connection to future trial testimony. In *Rehberg*, the Supreme Court noted that its grant of absolute immunity for trial testimony would be "easily frustrated" if "a criminal defendant turned civil plaintiff," possessing little evidence but the false trial testimony, "could simply reframe a claim to attack the preparation instead of the absolutely immune actions themselves." 132 S. Ct. at 1506-07 (internal quotation marks omitted) (quoting *Buckley* v.

*Fitzsimmons*, 509 U.S. 259, 283 (1993) (Kennedy, J., concurring in part and dissenting in part)).  That said, the Court explicitly disclaimed the notion "that absolute immunity extends to *all* activity that a witness conducts outside of the grand jury room," noting in particular the falsification of affidavits and the fabrication of evidence.  *Id.* at 1507 n.1 (emphasis in original)).  Accordingly, the Second Circuit in *Coggins* upheld a claim based upon "Defendants' police reports, the [contradictory] statements of [another officer], [a defendant's] knowledge of the falsity of [another defendant's] police report, [a defendant's] statements to the district attorney, and police radio transmissions."  776 F.3d at 113 (footnote omitted).  The Court went on to note that "[i]f discovery were to establish that [the defendant officer's] statements to the district attorney constituted 'preparatory activity' conducted in advance of his grand jury testimony, [the officer] would be entitled to absolute immunity for that limited conduct" pursuant to *Rehberg*.  *Id.* at 113 n.7.  *Coggins*, then, effectively requires a court considering a claim of denial of fair trial based upon statements (rather than physical evidence) to distinguish between preparatory activity and pre-preparatory activity in determining absolute immunity.

A further hurdle to Plaintiff's fair trial claim is the question of admissibility.  Defendants correctly point out that none of the statements made by the Defendant Officers that might form the basis of the fair trial claim would have been directly admissible at such a trial; only the statements made at trial would be admissible, and those would be protected by *Briscoe*.  Yet accepting that a false statement itself must be admissible would ensure that a denial of

fair trial claim based upon a fabricated narrative could never successfully navigate the Scylla and Charybdis of admissibility and immunity, thus restricting the cause of action to fabricated physical evidence or confessions. Both the Supreme Court and the Second Circuit, however, have declined to endorse this result, maintaining the availability of a cause of action under Section 1983 against "law enforcement officials who falsify affidavits," *Rehberg*, 132 S. Ct. at 1507 n.1, and for false "police report[s], … statements to the district attorney, and police radio transmissions," *Coggins*, 776 F.3d at 113.

At least one court in this Circuit has resolved this dilemma by distinguishing between statements that are merely prefatory to a defendant officer's own testimony, and those that are designed to elicit the false testimony of others, thus forming an "extra-judicial course of conduct taken on the officer's part to secure the conviction of the plaintiff with a fabricated story." *Fappiano* v. *City of New York*, No. 01 Civ. 2476 (SLT)(SMG), 2015 WL 94190, at *20 (E.D.N.Y. Jan. 7, 2015) (internal alterations and quotation marks omitted) (quoting approvingly and distinguishing *Mitchell* v. *City of Boston*, 130 F. Supp. 2d 201, 213 (D. Mass. 2001)).  Such an analysis comports with that of the *Coggins* Court, which upheld a district court's finding that "conduct that laid the groundwork for [a criminal defendant's] indictment" could form the basis of liability for a subsequent Section 1983 action.  776 F.3d at 113.  Other courts have found that, under *Jovanovic*, a plaintiff "need not demonstrate that the purportedly false statements would reach a jury because he has demonstrated … that [a civil defendant's] alleged fabrication of evidence led to his brief pre-

trial detention." *Jean-Laurent* v. *Bowman*, No. 12 Civ. 2954 (KAM)(LB), 2014
WL 4662232, at *3 n.1 (E.D.N.Y. Sept. 18, 2014).  Finally, it has been noted,
under a reading of *Rehberg* subsequently ratified by *Coggins*, that

> courts in this Circuit have declined to grant absolute
> immunity to officers for allegedly falsifying evidence
> such as a post-arrest affidavit that contained allegedly
> false information; an allegedly false and misleading
> police report; and an allegedly false narrative of events
> preceding plaintiff's arrest provided to another officer,
> who in turn forwarded the information to the
> prosecutor, despite the fact that those officers may have
> testified before a grand jury as to the same facts
> underlying such evidence.

*Garnett* v. *City of New York*, No. 13 Civ. 7083 (GHW), 2014 WL 3950904, at *13
(S.D.N.Y. Aug. 13, 2014) (internal citations omitted) (collecting cases).  The
*Garnett* Court found that, "[c]onstruing the evidence in the light most favorable
to [the plaintiff] and drawing all reasonable inferences in his favor, a juror
could find that this allegedly fabricated evidence was likely to influence a jury's
verdict and deprived [the plaintiff] of his liberty as a result." *Id.*

The jury in this case, presented with overwhelmingly similar testimony
from the Defendant Officers and other officer witnesses as to Plaintiff's conduct
on both the train and the platform, deemed such evidence to be almost entirely
false, crediting Plaintiff's narrative instead.  That same false evidence was
written in police reports and memorialized in the criminal complaint relied
upon by the prosecutor — and, the jury was entitled to find, was relayed to the
prosecutor to persuade her to consider bringing felony charges against Plaintiff
in a manner that deprived him of his liberty.  The jury, weighing the credibility
of the witnesses presented to it, can only have concluded that the Defendant

Officers somehow harmonized their own false testimony to that of other officers to create a false narrative that influenced the course of Plaintiff's prosecution and would have influenced a jury.  In so finding, the jury necessarily engaged in a certain amount of speculation as to the shape that this collaboratively compiled false narrative would take upon being presented to a criminal jury. But that speculation is not a basis to invalidate a denial of fair trial claim; rather, it is an inevitable byproduct of *Ricciuti*'s sanctioning of denial of fair trial claims based on a trial that never occurs.  The Court is bound by that decision; it is therefore unwilling, where the jurors have already evaluated the evidence and the credibility of the witnesses, to overturn their judgment.  *See Cash*, 654 F.3d at 333; *Zellner*, 494 F.3d at 371.

### 2. Defendants Are Not Entitled to Qualified Immunity on the False Arrest Claim

Defendants next argue that the Defendant Officers are entitled to qualified immunity as to false arrest.  (Def. Br. 12-16).  A claim for false arrest by police officers, under both New York and federal law, requires that the arrest not be supported by probable cause.  *See Weyant* v. *Okst*, 101 F.3d 845, 852 (2d Cir. 1996).  The Second Circuit has made clear that "the probable cause inquiry is based upon whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest," and that a false arrest claim fails if the objective evidence indicates that there was probable cause to find any offense, not merely that invoked by the officers at the time.  *Jaegly* v. *Couch*, 439 F.3d 149, 153-54 (2d Cir. 2006) (citing *Devenpeck* v. *Alford*, 543 U.S. 146, 153 (2004)).  An arresting officer "enjoys

qualified immunity if 'it was objectively reasonable for the officer to believe that probable cause existed' or if 'officers of reasonable competence could disagree on whether the probable cause test was met.'" *Caceres* v. *Port Auth. of N.Y. & N.J.*, 631 F.3d 620, 622 (2d Cir. 2011) (quoting *Robinson* v. *Via*, 821 F.2d 913, 921 (2d Cir. 1987)).

Both parties agree that, if Plaintiff had his feet on the seats in violation of transit rules, there was probable cause to arrest him. Accordingly, Defendants rest their case for qualified immunity on the answers given by the jury on the special verdict form.[5] The jury found that Plaintiff was not sleeping and did not have his feet on the seats, but at the same time found that O'Connor and Percy, each of whom testified to seeing Plaintiff lying fully stretched out with his feet on the seats, believed that Plaintiff had his feet on the seats. (Def. Br., Ex. A). Defendants argue that "any reasonable officer would have felt he was … entitled to rely on what his own eyes were seeing," and that "[t]he reasonableness of this mistaken judgment is evidenced by the jury's finding

---

[5]     Defendants argue that the Court should have asked the jury directly whether the Defendant Officers' belief was "reasonable." (Def. Reply viii n.9). Yet as the Second Circuit has repeatedly affirmed, the ultimate determination of objective reasonableness is a task for the Court; the factfinder is to determine disputed *facts* that are material to that inquiry. *See Zellner*, 494 F.3d at 368 (collecting cases). Moreover, although Defendants did submit a proposed interrogatory with such a question, they did not object to the Court's proposed list of interrogatories on these grounds (Tr. 902-06), thus waiving the argument as to the interrogatories. *See Morse* v. *Fusto*, No. 07 Civ. 4793 (CBA)(RML), 2013 WL 4647603, at *22 (E.D.N.Y. Aug. 29, 2013) ("Although defendants included this instruction in their first proposed verdict sheet, they did not include it in their second proposed verdict sheet and made no objection to the lack of such an instruction in the Court's proposed instructions. Thus, such objection is waived."); *see also Zellner*, 494 F.3d at 368 ("To the extent that a particular finding of fact is essential to a determination by the court that the defendant is entitled to qualified immunity, it is the responsibility of the defendant to request that the jury be asked the pertinent question.").

that not one, but two different police officers, each from a different unobstructed vantage point, mistakenly believed that plaintiff had placed his feet on a subway seat." (*Id.* at 14 & n.18).

Although qualified immunity must be determined from the perspective of a reasonable officer "possessing the same knowledge as the officer in question," *Zellner*, 494 F.3d at 368 (quoting *Lee* v. *Sandberg*, 136 F.3d 94, 102 (2d Cir. 1997)), Defendants' argument would collapse the distinction between an objective and a subjective inquiry, essentially allowing one to infer objective reasonableness from sincere subjective belief. Yet the Supreme Court has cautioned that "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck*, 543 U.S. at 153. Defendants attempt to turn the officers' *belief* that Plaintiff had his feet on the seats into a *fact*: that the officers saw Plaintiff's feet on the seats. Yet a mistaken subjective belief is not a fact relevant to the objective existence of probable cause; to say otherwise, or to say that finding a sincere subjective belief in X is inconsistent with finding a perception of X to be objectively unreasonable, would be to transform the probable cause inquiry from an objective one into a subjective one.

Setting aside the jury's credence of Percy's and O'Connor's subjective beliefs that Plaintiff had his feet on the seats, the Court struggles to find any evidence in the record to suggest that it was objectively reasonable for two officers seeing a person seated with his feet on the floor — as the jury found was the case — to believe that there was probable cause to arrest him for

24

having his feet on the seats.  As Defendants themselves acknowledge, each officer testified to having "a different unobstructed vantage point" from which to view Plaintiff.  (Def. Br. 14).  Under these circumstances, no reasonable officer could have concluded that there was probable cause to arrest Plaintiff for having his feet on the seats, or any other conduct prior to his arrest, and thus O'Connell and Percy are not entitled to qualified immunity as to false arrest.[6]

### 3.   Plaintiff's Motion for Judgment as a Matter of Law and a New Trial on Damages as to the Assault and Battery Claim Is Granted

Under New York law, "[a]n assault is 'an intentional placing of another person in fear of imminent harmful or offensive contact'; a battery is 'intentional wrongful physical contact with another person without consent.'" *Sulkowska* v. *City of New York*, 129 F. Supp. 2d 274, 294 (S.D.N.Y. 2001) (quoting *Lederman* v. *Adams*, 45 F. Supp. 2d 259, 268 (S.D.N.Y. 1999)).  Thus, "[i]f an arrest is determined to be unlawful, any use of force against a plaintiff may constitute an assault and battery, regardless of whether the force would be deemed reasonable if applied during a lawful arrest."  *Id.* (collecting New York state cases); *accord Mesa* v. *City of New York*, No. 09 Civ. 10464 (JPO),

---

[6]     Because Percy and O'Connell lacked probable cause, or even arguable probable cause, to arrest Plaintiff, Bruno cannot obtain qualified immunity by operation of the "fellow officer" rule.  First, there is no objective knowledge establishing probable cause that can be imputed to Bruno.  Second, given the extent to which the jury discounted the Defendant Officers' version of events, there is no reason to believe that the jury concluded that *any* information, whether inaccurate or not, was passed to Bruno; accepting Plaintiff's testimony that he walked off the train of his own accord before ever being approached by O'Connor, there is no objective basis for an officer in Bruno's position to reasonably conclude that Plaintiff had been asleep or committing any other offense.

2013 WL 31002, at *32 (S.D.N.Y. Jan. 3, 2013) ("In New York, when there is no probable cause for an arrest, all force employed during that arrest is unlawful.").  In fact, where an arrest is unlawful and without consent, the use of force in an arrest *must* give rise to a claim for assault and battery. *See Johnson* v. *Suffolk Cnty. Police Dep't*, 665 N.Y.S.2d 440, 441 (2d Dep't 1997) (granting judgment as a matter of law on assault and battery after a previous judgment finding false arrest and a jury verdict finding for defendant on assault and battery).  Defendants effectively concede as much, arguing in opposition to Plaintiff's motion only that the Defendant Officers should be granted qualified immunity as to false arrest.  (Def. Opp. 2-3).

In the context of a general verdict, the Second Circuit has taken the position that "any inconsistency between general verdicts on [a plaintiff's] federal and state claims would not necessarily require retrial." *Cash*, 654 F.3d at 343 (citing *Globus* v. *Law Research Serv., Inc.*, 418 F.2d 1276, 1290 n.17 (2d Cir. 1969) ("[C]onsistent jury verdicts are not, in themselves, necessary attributes of a valid judgment [in a civil action]."); *U.S. Football League* v. *Nat'l Football League*, 644 F. Supp. 1040, 1045-46 (S.D.N.Y. 1986) (observing that consistent verdicts in separate claims not required), *aff'd*, 842 F.2d 1335 (2d Cir. 1988)).[7]  On the other hand, "[w]here there are seeming inconsistencies

---

[7]     As the Second Circuit made clear in *Cash*, a general verdict followed by a set of interrogatories going to specific theories of liability is not a special verdict even if the form submitted to the jury is labeled, as here, "Special Verdict Form."  654 F.3d at 343; *accord Lavoie* v. *Pac. Press & Shear Co.*, 975 F.2d 48, 54 (2d Cir. 1992) ("The charge to the present jury required that it consider the necessary legal principles given to it by the trial court and make determinations of ultimate liability.  In such case, the answers to the questions submitted to the jury are not special verdicts, despite the use of those words in the title appended to the form.").  Furthermore, the Second Circuit has

between interrogatory responses and a general verdict, a trial court should normally attempt to reconcile them," and "[w]hen the verdicts are not capable of reconciliation and resubmission of the determinations for reconsideration or clarification is not possible because the jury has been discharged, a new trial may be — but is not always — required." *Lavoie* v. *Pac. Press & Shear Co.*, 975 F.2d 48, 53 (2d Cir. 1992).

Here, the interrogatory responses are flatly inconsistent with the general verdict on assault and battery. The jury found that Plaintiff did not have his feet on the subway, was not occupying multiple seats, was not yelling or using abusive language prior to being handcuffed, did not intend to cause public annoyance or alarm, and did not grab any officer's shoulder; that the officers did not believe that Plaintiff was approaching them in a hostile manner; and that no one else crowded around or witnessed Plaintiff's interactions with the officers before or after he was issued a summons. (Def. Br., Ex. A). The jury did find that Plaintiff approached within two feet of the officers and physically touched one or more of them (*id.*), but Defendants have offered no offense for which this behavior would provide probable cause to make an arrest.

Where a jury returns both a general verdict and answers to written questions, and "the answers are consistent with each other but one or more is inconsistent with the general verdict," a district court may "(A) approve, for

---

endorsed the mechanism of submitting a general verdict to the jury, to be followed up with special interrogatories relevant to qualified immunity if the jury finds in favor of the plaintiff on any of the counts. *See Guzman* v. *Jay*, 303 F.R.D. 186, 196 (S.D.N.Y. 2014) (citing *Stephenson* v. *Doe*, 332 F.3d 68, 73 (2d Cir. 2003)).

27

entry under Rule 58, an appropriate judgment according to the answers, notwithstanding the general verdict; (B) direct the jury to further consider its answers and verdict; or (C) order a new trial." Fed. R. Civ. P. 49(b)(3); *see also Lavoie*, 975 F.2d at 53 (noting that "Rule 49(b) instructs the trial court how to proceed when there are inconsistencies between the answers to the interrogatories and the general verdict").

Although courts faced with such irreconcilable tensions generally opt for a new trial, the Court finds that entry of judgment in favor of Plaintiff as to the assault and battery claims is appropriate here due to Court's error in charging the jury.[8]  As noted *supra*, the Court drafted a charge that instructed the jury only that the assault and battery claim parallels that for excessive force, and failed to note that in the context of an *unlawful* arrest, any use of force constituted battery and any threatened use of force (such as saying "cuff him," or warning that Plaintiff would be sprayed with mace) constituted assault. Plaintiff timely objected to this charge, but the Court incorrectly charged the jury regardless.  Due to this error in charging the jury, there is actually no inconsistency between the jury's general verdict on assault and battery *as*

---

[8]     Plaintiff has not waived this claim.  Plaintiff noted after the general verdicts were returned the inconsistency between the verdicts regarding false arrest and assault and battery, and the Court indicated that any inconsistencies should be addressed by post-trial motion rather than resubmitting questions to the jury.  Thus, while the Plaintiff did not explicitly object to the inconsistency between the interrogatories and the general verdict, he adequately preserved the objection.  *See Kosmynka* v. *Polaris Indus., Inc.*, 462 F.3d 74, 83-84 (2d Cir. 2006) ("[T]here is no authority to support [the] contentions that, when faced with an inconsistent verdict, the onus is on the 'dissatisfied party' to *ensure* that the court keep the jury….  A litigant preserves the issue … by exposing the inconsistency before the jury is dismissed, so that the court has available to it the option of re-submitting the questions to the jury after some further instruction.").

*charged* and its answers to the interrogatories: nowhere in the interrogatory responses did the jury indicate that the force used was excessive.  Under these specific facts, it is not a case where in the presence of "[i]nconsistent verdicts … it is unclear whose ox has been gored."  *United States* v. *Powell*, 469 U.S. 57, 65 (1984).  It is quite clear, rather, that Plaintiff's ox has been gored, and thus that the entry of judgment as a matter of law, as contemplated by Federal Rules of Civil Procedure 49(b)(3)(A) and 50(b)(3), is appropriate.  Accordingly, Plaintiff's motion for judgment as a matter of law and a new trial as to damages is granted.

## CONCLUSION

For the reasons set forth in this Opinion, Defendants' motion for judgment as a matter of law or a new trial is DENIED, and Plaintiff's motion for judgment as a matter of law and a new trial as to damages is GRANTED.  The Clerk of Court is directed to terminate Docket Entries 78 and 81.

The parties are directed to appear before the Court for a status conference to discuss next steps in the litigation on **May 5, 2015, at 4:00 p.m.**, in Courtroom 618 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York 10007.

SO ORDERED.

Dated:      March 30, 2015
            New York, New York

_____
        KATHERINE POLK FAILLA
        United States District Judge